UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| v. | : | 23-CR-110 (RC) |
| **CORBIN GRAY** | : | |

### DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR SENTENCING PURSUANT TO D.C. YOUTH REHABILITATION ACT

Corbin Gray entered a plea of guilty to one count of felony threats in violation of District of Columbia Code § 22-1810, and they will appear before this Honorable Court for sentencing on September 20, 2024. Mx. Gray was diagnosed with autism at the age of three and was between 19 and 20 years old when the offense conduct occurred. The offense conduct is largely attributable to a lack of maturity and lack of appreciation for appropriate ways to communicate, advocate, and express opinions. As set forth in the Presentence Investigation Report ("PSR"), the recommended sentencing range under the District of Columbia Voluntary Sentencing Guidelines is 6 to 24 months of incarceration with probation as a permissible alternative to incarceration. Under the circumstances of this case and given Mx. Gray's background, the government agrees that a sentence of a five-year term of supervised probation is the appropriate sentence. *See* ECF at 4 (plea agreement). Because Mx. Gray is just 21 years old, the District of Columbia Youth Rehabilitation Act ("YRA") provides that the Court may impose a term of probation pursuant to the YRA and afford Mx. Gray an opportunity to rehabilitate and seek expungement of the record if the term of supervision is successfully completed. Doing so will give this very young defendant an opportunity to prove to the Court that they can live a law-abiding life and that the

life-long stigma of a felony conviction is unnecessary. The sentencing factors the Court must consider pursuant to 18 U.S.C. § 3553 support a sentence of supervised probation under the YRA.

## **Factual Background**

Mx. Gray has no prior criminal convictions. They grew up in Maryland. At the age of three, they were diagnosed with Autism Spectrum Disorder ("ASD"), which presents some challenges with the way Mx. Gray interacts with and views the world around them, but they are kind, intelligent, hard-working, and intellectually curious. They graduated from high school in 2021, and then began taking courses at Howard Community College, while continuing to live at home with their mother. Their parents are divorced, but shared custody as Mx. Gray was growing up. They remain close with both parents. Mx. Gray's early childhood, family background, and the impact ASD has had on their life are described fully in the attached report prepared by Dr. Sara Boyd. *See* Exhibit 1 (Report from Dr. Sara Boyd).

The conduct at issue here is related to Mx. Gray's opposition to the use of Applied Behavior Analysis (ABA). There is a great deal of online content regarding the debate and controversy related to the use of ABA for individuals diagnosed with ASD. Mx. Gray became interested in this controversy and found community and connection with others who oppose the use of ABA therapy. The offense at issue here occurred when their expressions of opposition to ABA therapy turned from free and lawful speech to threats, which they now deeply regret. *See* Exhibit 2 (Letter from Corbin Gray).

The unlawful way in which Mx. Gray expressed opposition to ABA therapy was unquestionably influenced by their commit to advocating for people with ASD. While Mx. Gray found the views of others frustrating, Mx. Gray has no history of engaging in physical aggression

toward others as a result of this frustration. *See* Exhibit 1 at 4. Their interest in ABA therapy—and more specifically saving other children who are diagnosed with ASD from ABA theory—became somewhat obsessive as they became immersed in online content regarding the treatment of individuals with ASD and critiques of ABA. As their parents describe, they "extended and exaggerated these critiques, in their own mind, to a conceptualization of autism treatment providers as advocates for the genocide of autistic people, and ABA as a form of violent oppression." *Id.* at 5. In the summer of 2022, the intensity of their views was exacerbated by depression and perhaps their inconsistent adherence to medication prescribed in relation to gender dysphoria.

As their views intensified and they excessively focused on online content, they began to make statements that went beyond advocacy. While recognizing that the statements were threatening, they did not intend to commit any violence or harm anyone. Over the past year and a half, they have learned a very hard lesson about the harm caused by threats and the consequences of making threats.

On March 31, 2023, the government filed a criminal complaint charging Mx. Gray with making threats in violation of federal law, and the Court issued an arrest warrant. Later that day, a detective with the Howard County Police Department contacted Mx. Gray's mother and informed her that police in the District of Columbia wanted to speak with Mx. Gray. Mx. Gray's mother then contacted Mx. Gray's father and asked him to help Mx. Gray respond to that request. Mx. Gray then went to their father's house, and their father called the detective back. A short time later, agents with the Federal Bureau of Investigation (FBI) called Mx. Gray's father and told him that Mx. Gray needed to meet them outside the house. After the FBI agents

3

explained that they had a warrant, Mx. Gray and their father walked outside to meet the agents. Mx. Gray was then arrested and cooperated with the agents.

Mx. Gray was presented before the District of Columbia Superior Court on Saturday, April 1, 2023. At the government's request, the court ordered them held without bond pending a detention hearing. This began a twelve-day period at the D.C. Jail that was extremely impactful. Mx. Gray, who has always been a very strict rule-follower, learned a very difficult lesson in what is and is not acceptable speech and advocacy for their views. Detention is difficult for anyone, but for a then-twenty-year-old with ASD who had never before spent a night away from parents, this experience was disorienting and terrifying. They were released on conditions on April 12, 2023, and their behavior on release has demonstrated a strong desire and intent to following the rules and never again be detained.

Since their release, Mx. Gray has complied with the very strict conditions imposed by the Court.[1] Initially, they were on home incarceration with around the clock monitoring by third-party custodians. Over time, as Mx. Gray continued to comply, the Court gradually loosened the restrictions.

While on release, Mx. Gray initially was unable to leave the house for employment. The Court later indicated that if they found a job the Court would consider permitting them to leave the house to work, but looking for employment without access to the internet was difficult. On July 23, 2024, the Court permitted them to use the internet for job searches, but they continue to struggle to find employment. To assist with his search for employment, Mx. Gray sought and

---

[1] During seventeen months of pretrial release, Mx. Gray missed one call to Pretrial Services during a week that the family was sick with COVID and several calls in August 2024. Otherwise Mx. Gray has complied with every condition without incident.

obtained assistance from the Montgomery County Department of Rehabilitation Services, *see* Exhibit 3 (Individualized Plan for Employment), and registered for the Maryland Workforce Exchange. With these services, Mx. Gray hopes to obtain employment and plans to reenroll in school to continue their education.

## Argument

When imposing a sentence, the Court must consider several factors, including the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a); *United States v. Booker*, 543 U.S. 220, 259 (2005). Because the United States Sentencing Guidelines do not apply, the Court should also consider the District of Columbia Voluntary Sentencing Guidelines. These factors support a sentence to a term of probation under the YRA. An additional term of incarceration would be greater than necessary to serve the purposes of sentencing. *See* 18 U.S.C. § 3553(a) (court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]" (emphasis added)).

    a.  **District of Columbia Voluntary Guidelines**

As set for the in the PSR, the District of Columbia Voluntary Sentencing Guidelines authorize a sentence of probation. The sentencing range is 6 to 24 months incarceration with probation permissible. PSR ¶ 92.

b.  **The Nature and Circumstances of the Offense**

As described above, the charges in this case stem from Mx. Gray's support of a community of people who are opposed to ABA therapy. Due to their own diagnosis of autism, Mx. Gray—like many people with this diagnosis—developed strong feelings in opposition to this form of therapy which many view as an attempt to change the nature of people with autism and force them to become something they are not. Mx. Gray's goal was to educate people about the negative impacts of this therapy and eliminate its use. In their zeal to express these opinions and gain attention for this cause, Mx. Gray's rhetoric became threatening. They recognize that they acted recklessly by making these false threats, but they did not intend to commit violence.

Before their arrest, Mx. Gray posted a video that clearly stated their lack of intent to commit violence, stating that they only wanted to scare people. Following their arrest, in an interview conducted by law enforced, Mx. Gray repeated their aversion to violence, stating: (1) they are against anything illegal; (2) they believe in due process and any steps against those who practice ABA should be done through due process; (3) they had no plan to harm anyone; (4) they are not a violent person; (5) when asked if they had any "personas" that were violent, they said, "no" (and said they had no alternative "persona," only screennames online) (6) they have no guns and no access to guns; (7) they "used to have" violent thoughts but when hospitalized, discussed them and never acted on them; (8) they apologized for making Autistic people look bad; (9) they regretted going to the offices of Autism Speaks and would not go back; and (10) they noted that after being told not to go back, they did not.

Mx. Gray now fully understands that threats alone are harmful and damaging to the targets of those threats. More specifically, they recognize that their conduct caused harm to those

6

at Autism Speaks who heard them and feared that they would act on the threats. For that, Mx. Gray is deeply remorseful.

   c. **History and Characteristics of Mx. Gray**

As described more fully above, Mx. Gray is just 20 years old with no criminal history. Although diagnosed with ASD, they have worked hard to graduate from high school and begin college course. While on pretrial release for nearly a hear and a half, they have demonstrated a commitment to complying with the law, obtaining counseling, and working toward furthering their education and gaining employment. *See* Exhibit 4 (Letter from Carol L. Garey, LCSW-C). Mx. Gray has a supportive family, who—after learning of the charged offenses—worked to help ensure that Mx. Gray has the support needed to correct their behavior. Mx. Gray's father confirms that Mx. Gray has learned from their mistakes. *See* Exhibit 5 (Letter from Milton Gray).

   d. **The Purposes of Sentencing and Need to Avoid Unwarranted Disparities**

The Court must impose a sentence that reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, affords adequate deterrence, and protects the public, while avoiding any unwarranted disparity. Under the circumstances of this case, a prison term is not necessary to serve the purposes of sentencing, and a sentence to a term of probation under the YRA will not result in an unwarranted disparity.

Mx. Gray was arrested on April 3, 2023, and detained at the District of Columbia Central Detention Facility ("D.C. Jail") for 9 days until their release on April 12, 2023. Mx. Gray was just 20 years old at the time and had never before spent a night anywhere without family. This experience was terrifying and impactful, serving the purpose of deterrence. Under these

7

circumstances, additional incarceration is not necessary to reflect the seriousness of the offense or promote respect for the law.

When releasing Mx. Gray on April 12, 2023, Magistrate Judge Moxila A. Upadhyaya imposed very strict conditions of release, including home incarceration with electronic monitoring, constant monitoring by a third party custodian, and no access to the internet. With the exception of a few telephone calls to check-in with Pretrial Services, Mx. Gray has complied with the conditions of release without incident. This strict compliance with the conditions of release demonstrates Mx. Gray's respect for court orders. Mx. Gray is generally a strict rule-follower and the impact that the time spent at the D.C. Jail had—making them fear ever returning to jail—has reinforced their respect for the law.

The conditions of release have themselves served the purpose of punishment. Mx. Gray served approximately a year on home incarceration and for the first five months could not leave the house alone. Although the Court has gradually eased some of the restrictions, first allowing Mx. Gray to be home alone several days a week and permitting them to drive to therapy appoints and between their parents' homes, the home detention continued until the plea hearing on April 12, 2024. Since then, while Mx. Gray has been subject to a curfew without home detention, some of the strictest conditions have remained, including electronic monitoring and restrictions on internet access.

The combination of the period of detention at the D.C. Jail, home incarceration, and a term of probation will be sufficient to act as both specific deterrence and general deterrence, given the unique circumstances of this case. A sentence of probation itself is a "'substantial restriction of freedom'" that can serve the purpose of sentencing. *Gall*, 128 S.Ct. at 595 (citation

8

omitted). As the Supreme Court has recognized, while custodial sentences are qualitatively more severe than probationary sentences, a term of probation also is a substantial restriction of liberty. *Id*. at 595-96, *citing United States v. Knights*, 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled'" (quotation omitted)).

The Court must consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Whether any difference among sentences is warranted or unwarranted depends on the individual circumstances of each case and their relationship to the purposes of sentencing. "Unwarranted disparity is defined as different treatment of *individual* offenders who are similar in relevant ways, or similar treatment of *individual* offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004).

In this case, imposing a term of probation will avoid an unwarranted disparity between Mx. Gray and other defendants with ASD. Courts across the country have recognized ASD as a mitigating factor that can support imposition of a term of probation in lieu of incarceration even for very serious offense. *See, e.g., United States v. Huseth*, No. 18-20027-JAR, 2021 WL 4940915 (D. Kan. Oct. 22, 2021) (recognizing impact of ASD and associated cognitive deficits, along with defendant's compliance with conditions of release and character for following rules, court imposed term of probation for possession of child pornography); *United States v. Santillo*, No. 3:14-cr-00194-AWT, ECF No. 79 (D. Conn. Aug. 9, 2016) (five year term of probation for

9

mailing threatening communications).

   e.  **Youth Rehabilitation Act**

The YRA provides: "If the court determines that a youth offender would be better served by probation instead of confinement, it may suspend the imposition or execution of sentence and place the youth offender on probation." D.C. Code § 24-903(a)(1). A "youth offender" is defined as "a person 24 years of age or younger at the time that the person committed a crime other than [the listed offenses, not including threats]." D.C. Code § 24-901(6). As part of such a sentence, the Court must include not fewer than 90 hours of community service. D.C. Code § 24-903(a)(2).

When considering whether to impose a sentence pursuant to the YRA, the Court is required to consider the following factors:

> (A) The youth offender's age at the time of the offense;
>
> (B) The nature of the offense, including the extent of the youth offender's role in the offense and whether and to what extent an adult was involved in the offense;
>
> (C) Whether the youth offender was previously sentenced under this subchapter;
>
> (D) The youth offender's compliance with the rules of the facility to which the youth offender has been committed, and with supervision and pretrial release, if applicable;
>
> (E) The youth offender's current participation in rehabilitative District programs;
>
> (F) The youth offender's previous contacts with the juvenile and criminal justice systems;
>
> (G) The youth offender's family and community circumstances at the time of the offense, including any history of abuse, trauma, or involvement in the child welfare system;

 (H) The youth offender's ability to appreciate the risks and consequences of the youth offender's conduct;

 (I) Any reports of physical, mental, or psychiatric examinations of the youth offender conducted by licensed health care professionals;

 (J) The youth offender's use of controlled substances that are unlawful under District law;

 (K) The youth offender's capacity for rehabilitation;

 (L) Any oral or written statement provided . . . by a victim of the offense . . . ; and

 (M) Any other information the court deems relevant to its decision.

These factors weigh in favor of imposing a YRA sentence here: (A) Mx. Gray was between 19 and 20 years old at the time of the offense; (B) although no adult was involved in the offense, Mx. Gray was highly influenced by online content posted by others; (C) Mx. Gray has no prior YRA sentence (or any other sentence); (D) Mx. Gray strictly complied with the rules at D.C. Jail and the conditions of pretrial release; (E) Mx. Gray is participating in therapy and employment services available in Montgomery County; (F) Mx. Gray has no previous contacts with the juvenile or criminal justice system; (G) Mx. Gray does not have a history of family trauma but has struggled related to ASD; (H) because of their youth, Mx. Gray did not appreciate the risks and consequences of their conduct, but now fully understands those risks and consequences; (I) Dr. Boyd's report supports a YRA sentence; (J) Mx. Gray has no history of substance abuse; (K) Mx. Gray has a strong capacity for rehabilitation and change; and (L) the victim has chosen not to submit a statement (presumably taking into account Mx. Gray's ASD diagnosis). *See also* Exhibit 1 at 13-14.

The YRA was designed to give young people a chance to move forward in their lives without the weight of a felony conviction. Sentencing Mx. Gray under the YRA will give them an opportunity to have the conviction set aside and remove that stigma, if they demonstrate such removal is appropriate. Imposing a sentence under the YRA does not guarantee expungement. Mx. Gray will need to spend years on probation demonstrating that they are deserving of a clean record, and only after years of probation will the Court make the final decision regarding expungement. Thus, imposition of a sentence under the YRA merely allows the Court to reserve the opportunity to assess whether expungement is appropriate.

f.  **Conditions of Supervision**

The Probation Office and the government have recommended conditions of supervision. *See* PSR at ¶ 4. Mx. Gray will comply with all conditions imposed by the Court, and for the most part, does not object to the conditions recommended by the Probation Office and the government. However, several of the conditions suggested by the government are beyond what is necessary and appropriate. First, the government recommends that Mx. Gray submit to a neuropsychological assessment/screening that was recommended by Dr. Boyd in a report dated October 25, 2023, which the defense previously provided to the government in support of the defense request for a plea offer that allowed the imposition of a sentence pursuant to the YRA. Dr. Boyd has not made that same recommendation in her recent report dated September 10, 2023. The September 2023 report updated the October 2023 report based on Mx. Gray's compliance with therapy and conditions of release and Dr. Boyd's more recent interview of Mx. Gray. The condition recommended by the Probation Office requiring compliance with

mental health treatment and continued participation in therapy will be sufficient to ensure Mx. Gray continues to maintain their mental health.

Second, the government asks the Court to direct that Mx. Gray "not access the internet without permission from their probation officer or a third-party supervision." Gov't Memo. at 12. While this was a condition of pretrial release, it is unnecessary as a condition of probation because the Probation Office has the capacity to implement computer monitoring that will monitor Mx. Gray's computer usage—the Pretrial Services Agency does not have this capability. Continuing to completely restrict internet access would be unnecessarily punishing, particularly for a young person today when internet usage is a pervasive means of learning information and communicating with others. Mx. Gray has fully complied with pretrial conditions preventing internet access for more than a year. This time has impressed upon Mx. Gray the importance of limiting internet usage to lawful activities. The computer monitoring proposed by the Probation Office will sufficiently ensure that Mx. Gray does not misuse the internet.[2]

## Conclusion

For the foregoing reasons and such other reasons as may be presented at the sentencing hearing, Mx. Gray respectfully requests that the Court impose a sentence of a term of probation pursuant to the YRA.

---

[2] Due to Mx. Gray's lack of resources and struggle to obtain employment, counsel requests that the Court waive the costs of computer monitoring.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

/s/
_____
MARY MANNING PETRAS
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C. 20004
(202) 208-7500 ext. 5109